IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

SEP 15 2006

B~ ~~~ Clerk
~v Clerk

FERGUS ROBINSON, DON GURLEY,
IRISH NIXON, RODRIGUEZ
THORNTON, ANTAVIUS ROBINSON,
and WILLIE SANFORD,

     Plaintiffs,

v.

PARAGON FOODS, INC.,

     Defendant.

CIVIL ACTION NO.

1:04-CV-2940-JEC

## O R D E R   &   O P I N I O N

This case is presently before the Court on defendant's Motion for Leave to File Excess Pages [65], plaintiffs' Motion for Partial Summary Judgment [66], defendant's Motion for Partial Summary Judgment [67], and defendant's Motion to Supplement its Motion for Partial Summary Judgment [92]. The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that defendant's Motion for Leave to File Excess Pages [65] should be **GRANTED**, plaintiffs' Motion for Partial Summary Judgment [66] should be **DENIED**, defendant's Motion for Partial Summary Judgment [67] should be **GRANTED in part** and **DENIED in part**, and

AO 72A
(Rev.8/82)

defendant's Motion to Supplement its Motion for Partial Summary Judgment [92] should be **GRANTED**.

## BACKGROUND

This is a race discrimination case.  In the Spring and Summer of 2003, Defendant Paragon Foods operated a Huddle House restaurant in Cairo, Georgia.[1]  (Pls.' Statement of Material Facts ("PSMF") [66] at ¶ 2.)  During the relevant time period, the Cairo Huddle House was open 24 hours a day, seven days a week.  (*Id.* at ¶ 5.)  Plaintiffs are black customers of the Cairo Huddle House.  (*Id.* at ¶ 1.)  They claim that defendant discriminated against them by instituting a "no dining-in policy" at the Cairo Huddle House between the hours of 2 a.m. and 5 a.m. on Sunday mornings.  (Compl. [1].)

The parties essentially agree on the details of the policy. Between 2 a.m. and 5 a.m. on Sunday mornings, customers were not allowed to dine inside the Cairo Huddle House.  (PSMF at ¶ 6; Def.'s Resp. to PSMF [85] at ¶ 6.)  During this time period, customers waited in a line outside the Huddle House, and entered the restaurant in groups of ten.  (PSMF at ¶ 7.)  Once inside the restaurant, the customers were required to place to-go orders.  (*Id.* at ¶ 8.)  Their

---

[1]  Defendant changed the name of the restaurant to "3 Squares Diner" in August, 2004.  (PSMF at ¶ 2.)  For purposes of these motions, the Court will refer to the restaurant by its name during the relevant time period, the Cairo Huddle House.

orders included a 25-cent to-go fee and a 10% waitress gratuity. (*Id.* at ¶¶ 9-10.)

Defendant contends that it adopted the policy to address crowd control issues. (Def.'s Statement of Material Facts "DSMF" [67] at ¶ 1.) Defendant claims that 200-300 people regularly descended upon the Huddle House between 2 and 3 a.m. on Sunday mornings. (DSMF at ¶ 13.) According to defendant, the sheer number of people who came to the restaurant on Sunday mornings raised safety and liability issues. Indeed, the parties agree that the Huddle House is at capacity when thirty-six to thirty-eight people are present. (*Id.* at ¶ 6.)

In addition, defendant contends that the Sunday morning crowd was particularly unruly and chaotic. (*Id.* at ¶ 15.) Defendant cites evidence that members of this crowd: attempted to bring beer cans into the restaurant, dumped sugar, salt, and pepper onto the tables, cursed and violently threatened Huddle House employees, engaged in fights, and frequently left without paying their bills. (*Id.* at ¶¶ 16-19.)

Plaintiffs claim that the Sunday morning crowd behaved in an appropriate manner. (Pls.' Response to DSMF [83] at ¶ 15.) However, plaintiffs do not dispute that on Sunday mornings the Cairo Police Department regularly posted two patrol vehicles across the street

3

from the Huddle House to respond to disruptions at the restaurant. (DSMF at ¶ 20.)   They also do not deny that, on one occasion, the Sunday morning crowd grew so chaotic that the police had to mace the entire restaurant due to a fight in the cook's area.   (*Id.* at ¶ 21; Pls.' Resp. to DSMF at ¶ 21.)   Plaintiffs further acknowledge that on another occasion, a Huddle House waitress had to go to the emergency room after being hit with a sugar shaker during her Sunday morning shift.   (*Id.* at ¶ 26.)

Most, if not all, of the Sunday morning crowd arrived at the Huddle House after spending the evening at "The Zodiac" in Cairo. (DSMF at ¶ 12; Pls.' Resp. to DSMF at ¶ 12.)   The Zodiac is a predominantly black nightclub, open only on Saturday nights and holidays.   (DSMF at ¶¶ 7-8; Pls.' Resp. to DSMF at ¶¶ 7-8.)   The Zodiac serves alcohol, and, according to defendant, has a reputation for drunkenness, illegal drugs, and fighting.   (DSMF at ¶¶ 9-10.) Several plaintiffs testified that they witnessed fights, rowdy behavior, drunkenness, and drug use at the Zodiac.   (F. Robinson Dep. at 22-24; Gurley Dep. at 21-22; A. Robinson Dep. at 19; Nixon Dep. at 27-28, 33; Thornton Dep. at 27.)   The Zodiac closed on Sunday mornings at 3:00 a.m.   (DSMF at ¶ 11.)   At closing time, many people from the Zodiac reconvened at the Huddle House because it was the only Cairo restaurant open 24 hours a day.   (Pls.' Resp. to DSMF at ¶ 12.)

4

Because most of the Sunday morning Huddle House crowd came from the Zodiac, the majority of the crowd was black.  (PSMF at ¶ 11.) Plaintiffs do not have exact figures, but they estimate that the crowd was approximately 80-90% black.  (*Id.*; Def.'s Resp. to PSMF [85] at ¶ 11.)  Plaintiffs acknowledge that black customers received the same service as whites or hispanics when they went to the Cairo Huddle House at any other time of the day or night.  (Sanford Dep. at 19-20; Nixon Dep. at 17; F. Robinson Dep. at 19-20; Gurley Dep. at 18; Thornton Dep. at 23.)   However, plaintiffs contend that defendant's Sunday morning no-dining-in policy, implemented at a time when most of the customers were black, constitutes race discrimination.  (Compl. [1]; PSMF at ¶ 15.)  Plaintiffs also claim that the no-dining-in policy was enforced in a racially discriminatory manner.  (PSMF at ¶ 16.)  Specifically, plaintiffs claim that white customers who came to the Cairo Huddle House between 2 and 5 a.m. on Sunday mornings were allowed to enter the restaurant and enjoy "sit-down" dining services.  (*Id.*)   Plaintiffs assert claims under 42 U.S.C. § 1981 and Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a ("Title II") for race discrimination in public accommodations.  (Compl. [1] at ¶¶ 30-43.)  Plaintiffs also assert state law claims for deceptive trade and business practices. (*Id.* at ¶¶ 52-60.)

Both parties have filed motions for partial summary judgment.

5

AO 72A
(Rev.8/82)

Plaintiffs contend that the undisputed facts demonstrate race discrimination, and have filed a motion for partial summary judgment on their § 1981 and Title II claims. (Pls.' Mot. for Partial Summ. J. [66].) Defendant argues that questions of fact preclude summary judgment for plaintiffs on plaintiffs Antavius Robinson, Irish Nixon, and Willie Sanford's race discrimination claims. (Def.'s Resp. to Pls.' Mot. for Partial Summ. J. [85].) As to plaintiffs Fergus Robinson, Don Gurley, and Rodriguez Thornton, defendant contends these plaintiffs have not produced sufficient evidence of race discrimination to survive defendant's motion for summary judgment on their § 1981 and Title II claims. (Def.'s Mot. for Partial Summ. J. [67].) Defendant argues, further, that it is entitled to summary judgment on plaintiffs' claim for punitive damages, plaintiffs' state law claims under Georgia's Fair Business Practices Act, O.C.G.A. § 10-1-390, and Deceptive Trade Practices Act, O.C.G.A. § 10-1-372(a)(12), and plaintiff Rodriguez Thornton's retaliation claim. (*Id.*) Both plaintiffs' and defendant's motions for partial summary judgment are currently before the Court.

## DISCUSSION

### I.   Summary Judgment Standard

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."" FED. R. CIV. P. 56(c). A fact's materiality is determined by the controlling substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Id.* at 249-50.

Summary judgment is not properly viewed as a device that the trial court may, in its discretion, implement in lieu of a trial on the merits. Instead, Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of every element essential to that party's case on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In such a situation, there can be no genuine issue as to any material fact, as a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. *Id.* at 322-23 (quoting FED. R. CIV. P. 56(c)).

The movant bears the initial responsibility of asserting the basis for his motion. *Id.* at 323. However, the movant is not required to negate his opponent's claim. The movant may discharge his burden by merely "'showing'--that is, pointing out to the

7

district court--that there is an absence of evidence to support the non-moving party's case." *Id.* at 325.  After the movant has carried his burden, the non-moving party is then required to "go beyond the pleadings" and present competent evidence designating "'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. While the court is to view all evidence and factual inferences in a light most favorable to the non-moving party, *Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1988), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48 (1986).

## II.  Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs argue that the undisputed facts establish race discrimination as a matter of law. (Pls.' Mot. for Partial Summ. J. [66].)  Accordingly, plaintiffs contend that they are entitled to summary judgment on their § 1981 and Title II claims.  (*Id.*)  The Court does not agree.

Section 1981 provides:

(a) All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by

8

> white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.
>
> (b)   . . . For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.
>
> (c)   . . . The rights protected by this section are protected against impairment by non-governmental discrimination and impairment under color of State law.

42 U.S.C. § 1981.   To prevail on their § 1981 claims, plaintiffs "ultimately most prove that . . . defendant failed to perform a contractual obligation as a result of intentional discrimination on the basis of race." *Slocumb v. Waffle House, Inc.,* 365 F.Supp. 2d 1332, 1337 (N.D. Ga. 2005)(Duffey, J.)(citing *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania,* 458 U.S. 375, 391 (1982)).   *See also, Solomon v. Waffle House, Inc.,* 365 F.Supp. 2d 1312, 1321 (N.D. Ga. 2004)(Evans, J.)("a section 1981 claim requires a showing of (1) a failure to perform a contractual obligation (2) as a result of an intention to discriminate racially").

Title II provides:

> All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation . . . without discrimination or segregation on the ground of race, color, religion, or national

9

origin.

42 U.S.C. § 2000a.  As with their § 1981 claims, plaintiffs must demonstrate "an intention to discriminate racially" to prevail on their claims under Title II.  *Solomon,* 365 F.Supp. 2d at 1321, 1331 ("The inquiry for a § 2000a claim . . . is essentially the same [as] for a § 1981 claim.").

A plaintiff can use direct or circumstantial evidence to establish race discrimination under § 1981 or Title II.  Plaintiffs in this case rely on circumstantial evidence.  (*See* Pls.' Mot. for Partial Summ. J. [66] at 12-13.)  In a case involving circumstantial evidence, courts generally apply the burden-shifting *McDonnell Douglas* framework.  *Slocumb,* 365 F.Supp. 2d at 1337; *Solomon,* 365 F.Supp. 2d at 1321.

Under the *McDonnell Douglas* framework, plaintiffs must first establish a *prima facie* case of discrimination.  *Slocumb,* 365 F.Supp. 2d at 1338; *Solomon,* 365 F.Supp. 2d at 1321.  The burden of production then shifts to defendant to demonstrate a legitimate, nondiscriminatory reason for its actions.  *Slocumb,* 365 F.Supp. 2d at 1338; *Solomon,* 365 F.Supp. 2d at 1321.  If defendant meets this burden, plaintiffs must present sufficient evidence to demonstrate that the proffered reason is merely a pretext for discrimination.  *Slocumb,* 365 F.Supp. 2d at 1338; *Solomon,* 365 F.Supp. 2d at 1321-22.

10

To establish a *prima facie* case under § 1981, plaintiffs must show:  1) that they are members of a protected class; (2) that the allegedly discriminatory conduct concerned one or more of the activities enumerated in the statute, i.e., the making or performance of contracts, or the enjoyment of the benefits, privileges, terms, and conditions of the contractual relationship; and 3) that defendant treated plaintiffs less favorably with regard to the allegedly discriminatory act than defendant treated similarly situated persons who were outside plaintiffs' protected class.  *Slocumb,* 365 F.Supp. 2d at 1338 (citing *Benton v. Cousins Props., Inc.,* 230 F.Supp. 2d 1351, 1370 (N.D. Ga. 2002)(Carnes, J.)(adapting the *McDonnell Douglas* analysis to a § 1981 contract claim); *Solomon,* 365 F.Supp. 2d at 1322.   Similarly, to establish a *prima facie* case under Title II, plaintiffs must show that they:  1) are members of a protected class; 2) attempted to contract for services and afford themselves the full benefits and enjoyment of a public accommodation; 3) were denied the full benefit or enjoyment of a public accommodation; and 4) such services were available to similarly situated persons outside plaintiffs' protected class who received full benefits or who were treated better than plaintiffs.  *Solomon,* 365 F.Supp. 2d at 1331.

It is undisputed that plaintiffs are members of a protected class--they are all black.  (PSMF at ¶ 1; Def.'s Response to PSMF at ¶ 1.)  Defendant also concedes for purposes of this motion that its

11

no-dining-in policy relates to the making or performance of a contract. (*See* Def.'s Resp. to Pls.' Mot. for Partial Summ. J. [84].) As to plaintiffs' Title II claims, defendant does not deny that the Cairo Huddle House is a public accommodation, and that plaintiffs attempted to contract for, but were denied, dine-in services at the Cairo Huddle House between 2 and 5 a.m. on Sunday mornings. (*Id.*)

These undisputed facts, however, do not establish the last element of plaintiffs' § 1981 and Title II claims: that is, that defendant treated plaintiffs less favorably than similarly situated customers outside of plaintiffs' protected class. Defendant admits that it required customers arriving at the Cairo Huddle House between 2 and 5 a.m. on Sunday mornings to wait in line, enter the restaurant in groups of ten or less, and place to-go orders. (DSMF at ¶¶ 31-34.) Defendant also admits that it charged a 25-cent to-go fee and 10% waitress fee on all to-go orders. (*Id.* at ¶ 35.) But defendant insists that it applied the policy to *all* Sunday morning customers, regardless of race. (*Id.* at ¶¶ 41-42.) Construing the facts in favor of defendant, plaintiffs were not treated any differently than white or hispanic customers arriving at the Huddle House between 2 and 5 a.m. on Sundays.[2]

---

[2] Plaintiffs suggest that they can establish their *prima facie* case by showing that they received service in a "markedly hostile

12

Moreover, the record contains ample evidence that defendant had a legitimate, non-discriminatory reason for implementing the policy: namely, ensuring the safety of its employees and customers. (DSMF at ¶¶ 13-22.)  Defendant has produced evidence that the Sunday morning crowd was unruly and chaotic.   (*Id.* at ¶ 15.)   Specifically, defendant cites evidence that members of the Sunday morning crowd attempted to bring beer cans into the restaurant, dumped sugar, salt, and pepper onto the tables, cursed and violently threatened Huddle House employees, and engaged in physical fights.  (*Id.* at ¶¶ 13-22.)

Indeed, plaintiffs concede that on Sunday mornings the Cairo Police Department regularly posted two patrol vehicles across the street from the Huddle House to respond to disruptions at the restaurant.   (DSMF at ¶ 20; Pls.' Resp. to DSMF at ¶ 20.)   They do not deny that on one occasion the Sunday morning crowd grew so

---

manner." (Pls.' Mot. for Partial Summ. J. [66] at 15.)  This Court, along with most other courts in this district, has rejected the "markedly hostile manner" prong as "legally incorrect and . . . unhelpful." *Benton,* 230 F.Supp. 2d at 1370, n. 14.  *See also, Givens v. Waffle House, Inc.,* 2006 WL 211710 *7-8 (N.D. Ga. 2006)(Duffey, J.) (rejecting the "markedly hostile manner" standard in the restaurant context); *Jackson,* 413 F.Supp. 2d at 1360-61 (holding same); *Solomon,* 365 F.Supp. 2d at 1325 (finding the "markedly hostile" test "so vague as to be unhelpful"); *Slocumb,* 365 F.Supp. 2d at 1338, n.5 (noting the Court's rejection of the "markedly hostile" prong) *But see, Brooks v. Collis Foods, Inc.,* 365 F.Supp.2d 1342 (N.D. Ga. 2005)(Story, J.) (applying the "markedly hostile treatment" test).   Moreover, the no-dining-in policy does not treat black patrons who arrive at the Cairo Huddle House between 2 and 5 a.m. on Sunday mornings in any more hostile a manner than white patrons arriving at the Huddle House at the same time.

13

chaotic that the police had to mace the entire restaurant due to a fight in the cook's area.  (*Id.* at ¶ 21; Pls.' Resp. to DSMF at ¶ 21.)   They further acknowledge that on another occasion a Huddle House waitress had to go to the emergency room after being hit with a sugar shaker during her Sunday morning shift.  (*Id.* at ¶ 26.)[3]

The Huddle House security guard testified that the no-dining-in policy enabled him to gain some control over the crowd.  (DSMF at ¶ 40; Shaw Dep. at 61-65.)   He and other Huddle House employees testified further that many of the problems have ceased as a result of the policy.  (DSMF at ¶ 40; Shaw Dep. at 61-65.)  Karen Cromartie, a lieutenant with the Cairo Police Department, similarly testified that the policy has been effective.  (Cromartie Aff. at ¶ 10.)  This evidence more than meets defendant's "exceedingly light" burden of producing a legitimate, non-discriminatory reason for implementing the no-dining-in policy.  *Solomon,* 365 F.Supp. 2d at 1326 ("The defendant need not persuade the court that it was actually motivated by the proffered reasons.   Instead, 'it is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against plaintiff.'")(citing *Texas Dept. of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254-55 (1981)).

---

[3]  Indeed, had defendant not responded in some way to address the dangers posed to its staff and customers by the "Sunday morning" crowd, defendant might well have been sued under a state tort theory for any injuries suffered by this group.

14

Plaintiffs argue that they are entitled to summary judgment in any event, because the policy has a "disparate impact" on black customers.   (Pls.' Mot. for Partial Summ. J. [66] at 20-23.) Plaintiffs concede that disparate impact analysis does not apply to their § 1981 claims.  (*Id.* at 21.)  Without guidance from the Supreme Court or the Eleventh Circuit, the Court is hesitant to apply a disparate impact analysis to plaintiffs' Title II claims.   *See Arguello v. Conoco, Inc.,* 207 F.3d 803, 813 (5th Cir. 2000) (noting that the law is "generally unclear as to whether disparate impact claims are recognized under Title II" and declining to decide the issue), and *Akiyama v. United States Judo Inc.,* 181 F.Supp. 2d 1179, 1184 (W.D. Wash. 2002) (refusing to apply disparate impact analysis to a Title II claim involving religious discrimination).   As the court explained in *Akiyama*, "Title II precludes private and public actors from segregating or depriving individuals of services on account of their [race or] religion, a formulation which is more consistent with an intent to prevent disparate treatment than to prevent unintended adverse effects."  *Akiyama,* 181 F.Supp. 2d at 1185.   *Compare Griggs v. Duke Power Co.,* 401 U.S. 424, 431 (1971)(explaining that Title VII "proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation").

Even if the Court were to apply disparate impact analysis,

15

AO 72A
(Rev.8/82)

plaintiffs would not be entitled to summary judgment.   Assuming plaintiffs can establish that the no-dining-in policy has a "significantly discriminatory impact" on black customers, the overwhelming evidence in the record suggests that the policy "serves a legitimate, non-discriminatory business objective."   *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1274-75 (11th Cir. 2000) (discussing the burdens of proof and production applicable to disparate impact cases).   As discussed, defendant has produced evidence that it implemented the policy in response to disruptive and chaotic Sunday morning crowds that damaged defendant's facility, abused and frightened defendant's staff, and created serious safety and liability issues.  (DSMF at ¶¶ 13-22.)  To prevail on its summary judgment motion, plaintiffs must demonstrate, as a matter of law, that "an alternative, non-discriminatory practice would have served defendant's stated objective equally well."   *Joe's Stone Crab,* 220 F.3d at 1275.   They have not done so.

Finally, plaintiffs argue that the no-dining-in policy was not implemented in a race-neutral manner.   Plaintiffs all testified in their depositions that white customers were allowed to dine in on Sundays from 2 to 5 a.m., while black customers had to wait in line and place to-go orders.  (F. Robinson Dep. at 19, 37-45, 64; A. Robinson Dep. at 12, 22-23; Nixon Dep. at 16-24, 35; Gurley Dep. at 25, 28, 41-42, 57; Thornton Dep. at 35-36, 43, 46-47; Sanford Dep. at

16

33, 43.)  If true, these allegations would support a § 1981 or Title II claim.  However, the evidence on this issue is in dispute.  The record contains ample evidence that defendant enforced the policy in a race neutral manner, requiring all customers arriving at the Cairo Huddle House between 2 and 5 a.m. on Sunday mornings to place to-go orders, regardless of their race.  (DSMF at ¶¶ 41-42; Shaw Dep. at 53, 70; Patten Aff. at ¶ 6.)  Accordingly, plaintiffs' motion for summary judgment on their race discrimination claims should be **DENIED.**

### III. Defendant's Motion for Partial Summary Judgment

    A.    <u>Race Discrimination Claims</u>

    As discussed, the Court agrees with defendant that the no-dining-in policy is not, in and of itself, racially discriminatory. The only way that plaintiffs can prevail on their race discrimination claims is to show that defendant enforced the policy in a discriminatory manner, that is, that defendant allowed white or hispanic customers arriving at the Cairo Huddle House between 2 and 5 a.m. to dine in, while requiring similarly situated black customers to place to-go orders.  *See Slocumb,* 365 F.Supp. 2d at 1338; and *Solomon,* 365 F.Supp. 2d at 1321-22.

    Much of the evidence in the record supports defendant's claim that it enforced the policy in a race-neutral manner, requiring all

AO 72A
(Rev.8/82)

customers, including white and black police officers stationed at the Cairo Huddle House, to wait in line and place to-go orders between 2 and 5 a.m. on Sunday mornings. (DSMF at ¶¶ 41-42; Shaw Dep. at 53, 70; Patten Aff. at ¶ 6.) Nevertheless, plaintiffs have produced sufficient evidence to create a question of fact on this issue. As relevant to defendant's motion for summary judgment, plaintiffs Fergus Robinson, Don Gurley, and Rodriguez Thornton all testified that they saw white customers dine inside the Cairo Huddle House on Sunday mornings while black customers, including themselves, had to wait in line outside and place to-go orders. (F. Robinson Dep. at 19, 37-45, 64; Gurley Dep. at 25, 28, 41-42, 57; Thornton Dep. at 35-36, 43, 46-47.) The testimony of former Huddle House employee Yvonne Griffin supports plaintiffs' assertions. (Griffin Aff. at ¶¶ 7-8.) Griffin testified that defendant never refused white customers the opportunity to dine inside the restaurant, even after Huddle House locked its doors and instituted the no-dining-in policy at 2 a.m. on Sunday mornings. (*Id.*) Assuming this testimony is true, plaintiffs have established a *prima facie* case of discrimination under § 1981 and Title II.

Defendant has not offered any evidence of a legitimate, non-discriminatory reason for allowing white customers to dine in on Sunday mornings while requiring these plaintiffs and other black customers to place to-go orders. Instead, defendant denies

AO 72A
(Rev.8/82)

plaintiffs' allegations.   (See Def.'s Mot. for Partial Summ. J.
[67].)  As to Robinson, Thornton, and Gurley, defendant tries to link
these three plaintiffs' testimony to the evidence on a videotape that
plaintiffs produced in this case.  (*Id.* at 15-18.)  Defendant notes
that each of these three plaintiffs testified to seeing white
customers violating the no-dining-in policy on only one or two
occasions.  (*Id.*)  From this testimony, defendant concludes that
these incidents coincide with two scenes on a videotape that Fergus
Robinson created to document the no-dining-in policy.  (*Id.*)

Viewing the videotape, defendant points out that the first scene
on the videotape shows black and white customers sitting down in the
Huddle House, and that the second scene shows only white customers
sitting down in the Huddle House, but is dated July 5, 2003, a
Saturday.  (Def.'s Mot. for Partial Summ. J. [67] at 15-18.)
Defendant argues that the first scene does not demonstrate
discrimination because both black and white customers are in the
Huddle House, and the second scene does not show discrimination
because it was taken on a Saturday, when the policy was not in
effect.  (*Id.*)  Thus, defendant argues, the videotape does not
demonstrate discrimination, and consequently, Robinson, Thornton, and
Gurley's testimony also does not demonstrate discrimination.  (*Id.*)

Robinson, Thornton, and Gurley all unequivocally testified that,
on at least one occasion, they were made to wait in line and place

19

to-go orders, while white customers were allowed to dine in. (F. Robinson Dep. at 19, 37-45, 64; Gurley Dep. at 25, 28, 41-42, 57; Thornton Dep. at 35-36, 43, 46-47.) They did not specify, and it is not clear from their testimony, that they were referring to the incidents caught on videotape. Moreover, drawing all reasonable inferences in favor of plaintiffs, the second scene in the video shows white customers inside eating, while plaintiffs were required to wait outside and place to-go orders. This scene arguably supports plaintiffs' race discrimination claims, whether it occurred on Sunday morning, or on Saturday morning, when the no-dining-in policy should not have been in effect.

In short, the videotape does not clearly support plaintiffs' position in this case, but neither does it negate Robinson, Thornton, and Gurley's testimony that they were required to stand in line and place to-go orders while white customers were allowed to dine in. As the facts on this issue are in dispute, defendant's motion for partial summary judgment on plaintiffs Robinson, Thornton, and Gurley's race discrimination claims should be **DENIED**.

B.   Thornton's Retaliation Claim

Plaintiff Rodriguez Thornton has asserted a claim for retaliation under § 1981. (Compl. [1] at ¶ 44-51.) Thornton claims that defendant's security guard banned him from the Cairo Huddle

House after Thornton complained about defendant's alleged practice of allowing white customers to dine-in on Sunday mornings, while requiring Thornton and other black customers to wait in line and place to-go orders.  (*Id.*)

The Eleventh Circuit has concluded that § 1981 supports a cause of action for "retaliation [based on] a plaintiff's opposition to race discrimination." *Tucker v. Talladega City Sch.,* 171 Fed. Appx. 289 (11th Cir. 2006)(citing *Andrews v. Lakeshore Rehab. Hosp.,* 140 F.3d 1405, 1412-13 (11th Cir. 1998)).  *See also, Webster v. Fulton County,* 283 F.3d 1254, 1256 (11th Cir. 2002)(applying § 1981's retaliation proscription outside the employment context).  However, the Court has not precisely defined the contours of a § 1981 retaliation claim.  *Id.*  The *Tucker* Court applied the Title VII retaliation framework, but noted that it was an 'open question' whether the elements of § 1981 and Title VII retaliation claims are always the same.  *Id.*  *See also, Bass v. Orange County Bd. of Commissioners,* 256 F.3d 1095, 1120, n. 10 (noting uncertainty as to the elements of a § 1981 retaliation claim).  As the Circuit Court previously explained, "the concerns underlying a retaliation action brought pursuant to Title VII and § 1981 might, in some circumstances, be different," particularly "where the retaliation alleged is not based on the race of the complainant."  *Olmsted v.*

21

*Taco Bell Corp.,* 141 F.3d 1457, 1463, n. 4 (11th Cir. 1998)(citing *Little v. United Tech.,* 103 F.3d 956 (11th Cir. 1997)).

In this case, however, Thornton's allegations *do* involve retaliation based on race, specifically, retaliation based on Thornton's complaints about practices that he perceived to be racially discriminatory. (Compl. [1] at ¶¶ 44-51.) Defendant does not present any basis for applying a different analysis to these allegations than the framework ordinarily applicable to Title VII retaliation claims. (Def.'s Mot. for Partial Summ. J. [67] at 19-20.) Accordingly, the Court analyzes the claim under the Title VII retaliation framework. *See Tucker,* 171 Fed. Appx. at 296, and *Jeronimus v. Polk County Opportunity Council,* 145 Fed. Appx. 319, 326 (11th Cir. 2005)("Title VII and § 1981 'have the same requirements of proof and use the same analytical framework'")(citing *Standard v. A.B.E.L. Servs., Inc.,* 161 F.3d 1318, 1330 (11th Cir. 1998)).

In order to prevail on his § 1981 retaliation claim under the Title VII framework, Thornton must demonstrate that:  1) he engaged in protected conduct; 2) he suffered an adverse action; and 3) a causal connection exists between the two events. *Olmsted,* 141 F.3d at 1460; *Gupta v. Florida Bd.' of Regents,* 212 F.3d 571, 587 (11th Cir. 2000). Thornton testified that defendant banned him from the Cairo Huddle House immediately after he complained about the

22

restaurant's alleged practice of allowing white customers to dine in between 2 and 5 a.m. on Sundays, while requiring black customers to wait outside the restaurant and place to-go orders. (Thornton Dep. at 57-58.) Other testimony in the record supports Thornton's allegations. (A. Robinson Dep. at 27; Griffin Aff. at ¶¶ 7-8.) This evidence is sufficient to raise a question of fact on Thornton's retaliation claim.[4]

    C.   Punitive Damages

    Monetary damages, including punitive damages, are available under § 1981. *Splunge v. Shoney's, Inc.,* 97 F.3d 488, 491 (11th Cir. 1996); *Solomon,* 365 F.Supp. 2d at 1330. To recover punitive damages, plaintiffs must demonstrate that defendant "engaged in discriminatory practices with malice or with reckless indifference"[5] to plaintiffs' federally protected rights. *Splunge,* 97 F.3d at 491; *Solomon,* 365

---

    [4] Contrary to defendant's argument, *Benton* does not stand for the proposition that only a lawsuit or formal EEOC complaint constitutes "protected activity." (*See* Def.'s Mot. for Partial Summ. J. [67] at 19.) *Benton* merely recognized that plaintiff must engage in "protected activity" to prevail on a retaliation claim, and held that the plaintiff in that case had not satisfied that requirement. *Benton,* 230 F.Supp. 2d at 1381. Applying precedent in the employment context, engaging in "protected activity" can encompass more than filing a lawsuit or a formal EEOC complaint. *See Rollins v. Florida Dept. of Law Enforcement,* 868 F.2d 397, 400 (11th Cir. 1989)(recognizing that protected activity extends beyond formal complaints).

    [5] Malice is defined as "an intent to harm" and recklessness as "serious disregard for the consequences of one's actions." *Splunge,* 97 F.3d at 491.

23

F.Supp. 2d at 1330.  Defendant "may not be held liable for punitive damages for [its employees'] misconduct unless plaintiff[s] produce[] evidence that management ratified or approved the discriminatory acts."  *Slocumb*, 365 F.Supp. 2d at 1341-42 (finding evidence "minimally sufficient" to avoid summary judgment where plaintiffs complained to Waffle House's corporate office about alleged discrimination and Waffle House failed to properly investigate the allegations).  *See also, Splunge*, 97 F.3d at 491 (finding Shoney's "constructive knowledge" of its employees' discriminatory actions inadequate to support a punitive damages award).

Plaintiffs argue that the no-dining-in policy warrants punitive damages.  There is no question that defendant ratified the policy. (Newsome Dep. at 27-33; Moore Dep. at 20.)  The store manager of the Cairo Huddle House designed the policy, and defendant's president was aware of its implementation.  (Newsome Dep. at 27-33; Moore Dep. at 20, 32.)  As discussed, however, the policy, in and of itself, is not discriminatory.  Further, the overwhelming evidence in the record demonstrates that defendant adopted the policy to address serious safety and liability issues.  (DSMF at ¶¶ 15-22.)  There is no evidence that defendant instituted the policy with malice or reckless disregard of plaintiffs' federal rights.

As to the allegedly discriminatory enforcement of the policy, there is no evidence that any member of defendant's management was

24

aware of, much less ratified, these actions.  Plaintiffs and a former
Huddle House employee testified that the Huddle House security guard
allowed white customers to enter the restaurant between 2 and 5 a.m.
on Sunday mornings, and that unspecified Huddle House employees
allowed white customers to eat their food inside the restaurant,
while black customers were required to wait outside and place to-go
orders.  (F. Robinson Dep. at 19, 37-45, 64; Gurley Dep. at 25, 28,
41-42, 57; Thornton Dep. at 35-36, 43, 46-47; Griffin Aff. at ¶¶ 7-8;
R. Johnson Aff. at ¶¶ 5-6.)  Plaintiffs present no evidence that the
security guard or any of the other Huddle House employees referenced
in plaintiffs' testimony were members of defendant's management.  *See*
*Givens,* 2006 WL 211710 at *9 (granting summary judgment on
plaintiff's punitive damages claim after finding "no credible
evidence defendant knew of the incident plaintiffs allege").

In fact, those members of defendant's management who testified
in this case stated that the policy was implemented in a race-neutral
manner.   (Newsome Dep. at 27, 32-33; Moore Dep. at 42-44.)
Plaintiffs have not presented any evidence that any member of
management knew about or ratified the allegedly discriminatory
implementation of the policy.  Accordingly, plaintiffs cannot show
that defendant "acted with the state of mind required for the
imposition of punitive damages" under § 1981.  *Splunge,* 97 F.3d at
492.   Thus, defendant's motion for summary judgment on plaintiffs'

AO 72A
(Rev.8/82)

claim for punitive damages should be **GRANTED**.

    D.   <u>State Law Claims</u>

Plaintiffs assert claims under Georgia's Deceptive Trade Practices Act, O.C.G.A. § 10-1-372(a)(12), and Georgia's Fair Business Practices Act, O.C.G.A. § 10-1-399(a). (Compl. [1] at ¶¶ 52-60.) Both of these claims are based on defendant's practice of "adding a waitress tip to bills for take-out service even though a waitress was not used." (*Id.* at ¶¶ 53, 58.)

Georgia's Deceptive Trade Practices Act essentially prohibits "passing off" one's goods as those of another. *See* O.C.G.A. § 10-1-372. The Act provides, in relevant part:

> (a)  A person engages in a deceptive trade practice when, in the course of his business, vocation, or occupation, he:
>
> > (1)  Passes off goods or services as those of another; [or] . . .
> >
> > (12) Engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

O.C.G.A. § 10-1-372(a).

As an initial matter, this case does not involve "passing off" or similar unfair competition issues. *See Energy Four, Inc. v. Dornier Med. Sys., Inc.,*' 765 F. Supp. 724, 731 (N.D. Ga. 1991)(Forrester, J.)(explaining that Georgia's Deceptive Trade

Practices Act "involves the same dispositive questions as the Federal Lanham Act").   In addition, there is no evidence in the record to support plaintiffs' claim that waitress fees were "deceptive" in that "waitress[es were] not used" to process to-go orders.   (*See* Compl. [1] at ¶¶ 53, 58)   The undisputed evidence shows, instead, that waitresses were used to take, bag, and ring up take-out orders. (Newsome Dep. at 46, 58.)

Furthermore, it is undisputed that defendant posted signs in the Cairo Huddle House announcing the fees, in addition to listing the fees on all customer receipts.   (Newsome Dep. at 47; Newsome Aff. at ¶¶ 6-8 and Ex. A.)   The signs clearly state:   "ATTENTION.   A 10% GRATUITY IS ADDED TO ALL "TO GO" ORDERS FOR THE SERVERS WHO PREPARE THEM."   (Newsome Aff. at Ex. A.)   In light of this evidence, that plaintiffs personally "felt the need to question [Huddle House] employees about the fees" does not indicate customer confusion, or at least not reasonable confusion.   (*See* Pls.' Resp. to Def.'s Mot. for Partial Summ. J. [83] at 24.)

The undisputed evidence in the record negates any claim that the waitress fees could have caused a "likelihood of confusion." Accordingly, defendant's motion for summary judgment on plaintiffs' claims under Section 10-1-372(a)(12) should be **GRANTED**.

Plaintiffs have also asserted claims under Georgia's Fair

27

Business Practices Act, O.C.G.A. § 10-1-390, *et seq.* (Compl. [1] at ¶¶ 52-56.) Defendant contends that these claims are barred because plaintiffs did not comply with the notice provision of Section 10-1-399(b). (Def.'s Mot. for Partial Summ. J. [67] at 24.) The notice provision requires that:

> At least 30 days prior to the filing [of an action under the Act], a written demand for relief, identifying the claimant and reasonably describing the unfair or deceptive act or practice relied upon and the injury suffered, shall be delivered to any prospective respondent.

O.C.G.A. § 10-1-399(b). Notice is sufficient if it informs the recipient "of the underlying facts giving rise" to the asserted claims under the Act. *Stringer v. Bugg,* 254 Ga. App. 745, 747, 563 S.E. 2d 447 (2002).

Plaintiffs gave notice of their claims to Huddle House in November, 2003. (Pls.' Response to Def.'s Mot. for Partial Summ. J. [83] at Ex. 11.) The notice identified plaintiffs and described their prospective claims under the Act. (*Id.*) Huddle House acknowledged receipt of the notice, and stated that it would forward the notice to the attorney for defendant Paragon. (*Id.* at Ex. 14.) Defendant's attorney responded to the notice, and forwarded the notice to defendant's owner, Robert Newsome. (*Id.* at Ex. 15.) Defendant does not contest the sufficiency or timeliness of the notice. Accordingly, defendant's motion for summary judgment on

plaintiffs' claims under Georgia's Fair Business Practices Act, based on insufficient notice, should be **DENIED**.

### CONCLUSION

For the foregoing reasons, the Court finds that defendant's Motion for Leave to File Excess Pages [65] should be **GRANTED,** plaintiffs' Motion for Partial Summary Judgment [66] should be **DENIED,** defendant's Motion for Partial Summary Judgment [67] should be **GRANTED in part and DENIED in part**, and defendant's Motion to Supplement its Motion for Partial Summary Judgment [92] should be **GRANTED**.

SO ORDERED, this _15_ day of September, 2006.

_____
JULIE E. CARNES
UNITED STATES DISTRICT JUDGE

29